```
  X  FILED      ___ LODGED
  ___ RECEIVED  ___ COPY

        JUN 0 6 2006

   CLERK U S DISTRICT COURT
      DISTRICT OF ARIZONA
   BY_____ DEPUTY
```

1  Sid Leach (#019519)
   Andrew F. Halaby (#017251)
2  Monica A. Limón-Wynn (#019174)
   SNELL & WILMER L.L.P.
3  One Arizona Center
   400 E. Van Buren
4  Phoenix, AZ 85004-2202
   Telephone: (602) 382-6372
5  Attorneys for Plaintiff Hypercom Corporation
   sleach@swlaw.com
6  ahalaby@swlaw.com
   mlimon-wynn@swlaw.com

7

8              IN THE UNITED STATES DISTRICT COURT FOR THE

9                          DISTRICT OF ARIZONA

10

11 Hypercom Corporation,                    No. CV 04-0400 PHX PGR

12                Plaintiff,

13                                          **PLAINTIFF'S SECOND AMENDED
                                            COMPLAINT**
14 vs.

15

16 Omron Corporation,

17                Defendant.

18

19       Plaintiff Hypercom Corporation ("Hypercom") alleges for its Second Amended

20 Complaint against Defendant Omron Corporation as follows:

21                     **PARTIES, JURISDICTION AND VENUE**

22       1.      Hypercom Corporation is a corporation organized under the laws of the

23 State of Delaware having its headquarters and principal place of business at 2851 West

24 Kathleen Road, Phoenix, Arizona 85053, Maricopa County, Arizona.

25       2.      On information and belief, Defendant Omron Corporation (hereinafter

26 sometimes referred to as "Omron") is a company organized under the laws of the country

27 of Japan and has its principal place of business at 3-4-10 Toranomon Minato-Ku, Tokyo,

28

*(left margin, vertical text):* Snell & Wilmer L.L.P. / LAW OFFICES / One Arizona Center, 400 E. Van Buren / Phoenix, Arizona 85004-2202 / (602) 382-6000

1   105-0001 Japan.  Omron Corporation is a $4.5 billion dollar company with over 23,000

2   employees spread out across 35 countries.  Omron Corporation does business in the

3   United States, and maintains a regional management center at 1 East Commerce Drive,

4   Schaumburg, Illinois 60173.

5       3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)

6   because Hypercom is a citizen of the State of Arizona and of the State of Delaware, and

7   Omron is a citizen of a foreign state. The amount in controversy exceeds the sum or value

8   of $75,000, exclusive of interest and costs.

9       4.      This Court has personal jurisdiction over Omron because its conduct was

10  intentionally and expressly aimed at Hypercom in Arizona, causing harm, the brunt of

11  which is suffered and which Omron knew is likely to be suffered in Arizona.   The

12  exercise of personal jurisdiction over Omron is reasonable.

13      5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(d) because

14  Omron is an alien, and an alien may be sued in any district.

15                          **GENERAL ALLEGATIONS**

16      6.      Omron entered into an agreement with Verve L.L.C. ("Verve") for the

17  purpose of bringing patent infringement suits alleging infringement of Omron patents,

18  with the understanding that Omron would receive a percentage of the money that Verve

19  was able to extract from the people that Verve sued.  Under the current agreement, Omron

20  receives 50% of the profit obtained by Verve up to $10,000,000, and 40% of the portion

21  above $10,000,000.  From the beginning, Omron approved Hypercom as a target for

22  Verve to sue.  Neither Omron nor Verve had any good faith basis for asserting patent

23  infringement claims against Hypercom.

24      7.      Verve, L.L.C. purports to be a Texas Limited Liability Company organized

25  under the laws of the State of Texas, and claims that its principal place of business is in

26  Austin, Texas.  Verve is an entity controlled by Raymond M. Galasso and/or the Simon,

27  Galasso & Frantz law firm, and was created for the purpose of substituting Verve as the

28  plaintiff in patent infringement suits brought by Raymond M. Galasso and/or the Simon,

- 2 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   Galasso & Frantz law firm instead of naming the real party in interest as a party to the

2   suit.  Raymond M. Galasso is a partner in the firm of Simon, Galasso & Frantz, and is the

3   head of the law firm's intellectual property practice.  Raymond M. Galasso is also a

4   registered patent attorney.

5          8.     At the time that Verve was formed, Raymond M. Galasso owned 100% of

6   Verve and was designated as the managing partner of Verve.  Subsequently, Kevin R.

7   Imes obtained ownership of 50% of Verve, but paid no consideration for his 50% interest

8   in Verve.  Galasso had testified that there is no written agreement between Galasso and

9   Imes concerning the transfer of 50% of Verve to Imes, or any other written evidence to

10  substantiate the transaction.

11         9.     Verve is under capitalized and has few, if any, assets.  Verve does not make

12  or sell any products.  At the time that the suits were brought against Hypercom, Verve had

13  no offices.  Verve paid no rent, leased no space, and paid no electric bills.  Verve had no

14  telephone, and was not listed in any telephone listings.  Verve had no employees.  Verve

15  had no corporate records other than a certificate of incorporation.  Verve failed to observe

16  any corporate formalities.  Verve had no by-laws.  There were no minutes of any board of

17  directors meetings during the entire four and 1/2 years that Verve claims it has been in

18  existence.  There were no minutes of any shareholders meetings.  No board of directors

19  meeting or shareholder meeting had ever been held.  There were no resolutions adopted by

20  the corporation.  There were no policies adopted by the corporation.  There were no

21  financial reports, financial statements, or financial records for the corporation.  Verve had

22  never paid any dividends.  There was no record that Verve filed any tax returns prior to

23  2002.

24        10.    Verve now claims that it has "office space" at 6300 Bridgeport Parkway,

25  Building One, Austin, Texas.  However, this is the same location as the offices of the

26  Simon, Galasso & Frantz law firm.  Attached hereto as Exhibit 1, Exhibit 2, and Exhibit 3,

27  are true and correct copies of photographs of the office suite of the Simon, Galasso &

28  Frantz law firm.  Exhibit 1 shows the main door to the law firm's offices, and a plaque on

- 3 -

1  the wall immediately to the right of the door is visible in the photograph.  Exhibit 2 shows

2  a close up view of the plaque.  Verve's name and the law firm's name both appear on the

3  door to the same office suite.  Exhibit 3 shows a view of the reception area as seen

4  through the glass window next to the door.  Only the name of the law firm of Simon,

5  Galasso & Frantz is displayed on the wall inside the door, and there is only one place for a

6  receptionist.

7        11.    Verve is a façade used to perpetuate a scheme to extort money from

8  Hypercom by filing patent infringement suits against Hypercom without regard to whether

9  or not Hypercom infringes any of the asserted patents.  With the use of Verve as a façade,

10  parties sued by Verve were unable to obtain discovery relevant to the patent claims

11  asserted against them, because Verve claimed that it had no control over Omron and no

12  ability to get any information from Omron.

13        12.    Verve was used by Raymond M. Galasso to perpetuate the scheme of suing

14  Hypercom without regard to whether or not Hypercom actually infringed any of the

15  Omron patents, and by making the litigation as expensive as possible, in order to achieve

16  extortionate advantage by imposing excessive litigation expenses on Hypercom.

17  Together, Verve and Omron attempted to force Hypercom to pay Verve and Omron off in

18  order to buy peace from the excessive costs of the baseless litigation filed by Verve.

19        13.    Verve maintains a website, on which Verve describes itself as "an

20  Intellectual Property Service Provider."  Verve's web site describes Verve's business as

21  providing "patent litigation support."  Verve's web site states that, "Verve also assists

22  companies with enforcement activities through offering a turn-key enforcement campaign.

23  . . ."

24        14.    Omron was a knowing participant in Verve's unlawful scheme.  Omron

25  aided and abetted Verve's tortuous activities.  By using Verve as a façade, Omron

26  attempted to avoid any risk of liability for bringing patent infringement claims against

27  Hypercom without any good faith basis for doing so.

28

- 4 -

15.     On or about August 3, 2003, approximately one month before the first

lawsuit was filed against Hypercom, Omron's representative in the United States sent a

memorandum to Omron headquarters in Japan seeking approval for Omron to transfer two

initial patents to Verve so that Verve could sue Hypercom.  In this memorandum, Omron's

representative emphasized that Omron had "zero payment risk."  The memorandum said,

"In case of losing suit, as [Omron] is not a party of the suit, it has no risk...".  The

memorandum acknowledged Omron's knowledge and acquiescence in Verve's plan to sue

Hypercom in Michigan, and after suing Hypercom, then "negotiate a license."  According

to the memorandum, Omron would receive a portion of the profit that Verve made in

suing Hypercom.  A true and correct copy of this memorandum, together with a true and

correct English translation thereof, is attached as Exhibit 4 and is incorporated herein by

reference.

16.     On September 5, 2003, Raymond M. Galasso sent an email communication

to Herbert V. Kerner, acting on behalf of Omron, advising Omron that "We are targeting

filing suit for at least one of the two patents (the one set to expire in October) covered in

the Agreement with Omron next week." Galasso asked Kerner to get Omron's

representative to sign a separate "assignment document" that could be made public and

which would give the appearance of a complete transfer to verve of all ownership rights in

U.S. Patent No. 4,678,895. The "assignment document" was signed by Omron's

representative that day, and 6 days later Verve filed suit on that patent against Hypercom

in Michigan.

17.     Verve prepared a "Point-Of-Sale Portfolio Assessment and Market

Analysis" for Omron's patents, estimating that Verve could collect $372.5 Million more if

Omron would throw additional patents into the scheme. Verve's analysis suggests that

Verve and Omron could collect "from $979 Million to $4.9 Billion" if they were

successful in imposing a 1% to 5% royalty on everyone in the POS market.  In this

document, Verve proposed a lease-back arrangement in which Verve and Omron would

make it look like Omron's patents were assigned to Verve, but in reality the transfer was

- 5 -

1    "in the form of a lease back arrangement to Omron while Verve pursues licensing

2    activities."

3        18.     With knowledge of Verve's meritless lawsuit against Hypercom in

4    Michigan, Omron agreed to have Verve sue Hypercom on additional Omron patents.

5        19.     On or about October 28, 2003, Omron's representative in the United States

6    sent a second memorandum to Omron headquarters in Japan seeking approval for Omron

7    to transfer two more patents to Verve so that Verve could sue Hypercom again. In this

8    second memorandum, Omron's representative again emphasized that "Omron has zero

9    payment risk. In case of losing a suit, as it is not a party of the suit, it has no risk, even

10    other than money." A true and correct copy of this memorandum, together with a true and

11    correct English translation thereof, is attached as Exhibit 5 and is incorporated herein by

12    reference.

13        20.     In December 2003, Raymond M. Galasso met with Herbert V. Kerner "to

14    discuss Omron's POS portfolio opportunity." No other representative of Omron was

15    present at that meeting. In furtherance of those discussions, Raymond M. Galasso stated

16    that "Verve would also like to propose acting as a licensing agent for the additional

17    Omron POS assets. Omron would provide Verve an exclusive right to license (with rights

18    to litigate and enforce) the patents for a period of x years and would allow Verve to

19    license the POS patents with select targets. A revenue share for each successful license

20    will be paid to Omron based on the following schedule...". A true and correct copy of an

21    email communication with an attached proposal from Raymond M. Galasso to Herbert V.

22    Kerner is attached hereto as Exhibit 6 and is incorporated herein by reference.

23        21.     On February 4, 2004, Verve filed the present lawsuit against Hypercom in

24    the U.S. District Court for the Western District of Texas, and asserted one of the Omron

25    patents against Hypercom that was the subject of the second memorandum, dated October

26    28, 2003, and which is marked as Exhibit 5.

27        22.     In a letter dated April 23, 2004, Herbert V. Kerner sent a letter to Raymond

28    M. Galasso confirming that Omron had approved Hypercom as a "licensing target." A

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   true and correct copy of this letter is attached hereto as Exhibit 7 and is incorporated

2   herein by reference.

3       23.     On or about March 17, 2004, Omron's representative in the United States

4   sent a third memorandum to Omron headquarters in Japan seeking approval for Omron to

5   include 20 more Omron patents in the deal with Verve. In this third memorandum,

6   Omron's representative referred to this case that was originally filed in Texas, and to the

7   first case filed in Michigan, and noted that "there have been 23 companies as the target of

8   the exercising of rights approved by OC [Omron] to Verve." The third memorandum

9   predicted that a total of about 50 companies would be sued by Verve. The third

10  memorandum supported adding additional patents to the scheme with the statement, "By

11  adding the new patents, the power of Verve LLC in negotiation is reinforced, and the

12  profit by negotiation can be better guaranteed." A true and correct copy of this

13  memorandum, together with a true and correct English translation thereof, is attached as

14  Exhibit 8 and is incorporated herein by reference.

15      24.     Omron quickly approved the proposal, and two days later, on March 19,

16  2004, Omron's representative signed a written agreement purporting to set forth the

17  agreement between Omron and Verve. That same day, on March 19, 2004, Raymond M.

18  Galasso wrote a letter to Herbert V. Kerner acknowledging the deal struck with Omron

19  and confirming that Kerner (through an LLC owned by Kerner named DTK

20  Technologies) would be paid "a referral fee of ten percent (10%) of Verve's Net Proceeds"

21  from the Omron patents. A true and correct copy of this letter is attached as Exhibit 9 and

22  is incorporated herein by reference. Shortly after this, Herbert V. Kerner joined the law

23  firm of Baker Daniels. According to Omron's answers to Hypercom's interrogatories in

24  this case, Baker Daniels, and Omron, determined that the referral fee arrangement that

25  Verve had with Herbert V. Kerner "was not desirable." As far as Omron knew as of

26  February 2005, no money was ever paid to Kerner by Verve "under the terms of Verve's

27  letter." However, in an email communication from Verve to Herbert V. Kerner in January

28  2005, after Kerner had joined the Baker Daniels law firm, Verve acknowledged that

- 7 -

1  "Baker Daniels may have an interest in one or more of Verve's licensing opportunities"

2  and asked Baker Daniels to perform a conflicts check on a list of companies.

3      25.    The deal that was purportedly consummated on March 19, 2004, included

4  Omron's U.S. Patent No. 5,012,077.

5      26.    On July 20, 2004, Raymond M. Galasso sent an email communication to

6  Herbert V. Kerner stating that "We are now very close to filing the ITC action" and asking

7  for information from Omron that Verve needed in order to proceed with Verve's plan.  A

8  true and correct copy of this email communication is included in the attached Exhibit 10,

9  which is incorporated herein by reference.  That same day, Kerner replied to Galasso

10  indicating that Kerner had a meeting with Omron's representative and would "stay on

11  him" to get the information for Verve.  With Omron's prior knowledge and consent, on or

12  about July 31, 2004, Verve filed a complaint with the International Trade Commission

13  ("ITC") based upon Omron's U.S. Patent No. 5,012,077, and named Hypercom as a

14  respondent in that proceeding. Verve and Omron used the ultimate weapon in high cost

15  litigation tactics by bringing the ITC case against Hypercom because ITC proceedings are

16  expedited and are massive.  Based on Verve's complaint, on September 3, 2004, the ITC

17  instituted an investigation concerning Hypercom's alleged infringement of Omron's U.S.

18  Patent No. 5,012,077.  Omron received a copy of a press release concerning the ITC

19  proceeding and identifying Hypercom as one of the respondents.  A true and correct copy

20  of an email communication transmitting the press release to Omron is attached as Exhibit

21  11, which is incorporated herein by reference.

22      27.    On August 30, 2004, Verve filed suit against Hypercom in California

23  alleging infringement of Omron's U.S. Patent No. 5,012,077, the same patent involved in

24  the ITC proceedings.

25      28.    On September 16, 2004, Hypercom's representatives met with

26  representatives of Omron, including Herbert V. Kerner, concerning the patent

27  infringement claims that Verve had asserted against Hypercom in Michigan, Texas,

28  California, and the ITC proceeding in Washington, D.C.  Hypercom's representatives

- 8 -

1   demonstrated the operation of Hypercom's accused products, and showed why the

2   Hypercom products clearly did not infringe the Omron patents asserted against Hypercom.

3   Herbert V. Kerner assured Hypercom's representatives that Omron had the ability to settle

4   all of the patent infringement actions that Verve had brought against Hypercom.

5          29.    With knowledge of Verve's meritless patent infringement charges against

6   Hypercom in Michigan, Texas, California, and the ITC proceeding in Washington, D.C.,

7   Omron aided Verve in its efforts to extort money from Hypercom.  Omron contacted the

8   inventor of the patent asserted in the ITC proceeding (who was not an employee of

9   Omron) so the inventor (who was a critical witness in the patent case) would be "prepared

10  for any contacts he may receive from the other side."  Omron also contacted a lawyer in

11  Japan to assist in this endeavor.  A true and correct copy of an email communication from

12  Herbert V. Kerner to Raymond M. Galasso referring to Omron's efforts and assistance is

13  attached as Exhibit 12, and is incorporated herein by reference.  A true and correct copy of

14  an email communication from Raymond M. Galasso to the lawyer in Japan is attached as

15  Exhibit 13.  Galasso told the lawyer in Japan to "let me know as soon as possible if

16  anyone does try to contact [the inventor witness] and please instruct him not to discuss

17  anything with anybody about United States Patent No. 5,012,077 until we have a chance

18  to discuss first."  Omron's representative actively assisted in the ITC proceeding by

19  sending information to Verve's lawyers concerning prior decisions of the ITC on issues

20  involved in the case brought by Verve, as reflected by Exhibits 14 and 15 attached hereto

21  and which are incorporated herein by reference.  Omron's representative was involved in

22  discussions of "licensing strategy" with Raymond M. Galasso, as indicated by Exhibit 16

23  attached hereto and incorporated herein by reference.

24         30.    On February 7, 2005, the administrative law judge presiding over the ITC

25  proceeding determined that Verve did not own the Omron patents, and did not have a

26  sufficient interest in the Omron patents to sue on them without joining Omron as a party

27  to the suit.  After Omron declined to join the proceedings, Verve moved to withdraw its

28  complaint.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

- 9 -

31.     On March 2 and 3, 2005, Omron's corporate representative testified under oath that Omron, even at that late date, still did not have any good faith basis for accusing Hypercom of infringement of any of the Omron patents.

32.     On June 7, 2005, the administrative law judge presiding over the ITC proceeding brought against Hypercom by Verve imposed sanctions in the amount of $1,000,000 against Verve, the law firm of Simon, Galasso & Frantz, and Verve's principals Raymond M. Galasso and Kevin R. Imes, based upon findings of bad faith and abuse of process.  The administrative law judge found that Verve had brought the ITC action against Hypercom without any good faith basis for accusing Hypercom of infringement, and that Verve had not conducted an adequate pre-filing investigation as required by the ITC rule that is equivalent to Rule 11 of the Federal Rules of Civil Procedure.

33.     On June 8, 2004, the patent infringement claims originally brought against Hypercom in Michigan were dismissed.

34.     On March 8, 2005, the patent infringement claims brought against Hypercom in California were dismissed.

35.     On June 8, 2005, the patent infringement claims brought against Hypercom in the ITC proceeding were dismissed.

36.     On December 12, 2005, the patent infringement claims originally brought against Hypercom in Texas were dismissed.

37.     All of the baseless patent infringement claims alleging infringement of the Omron patents that were filed against Hypercom have been dismissed in favor of Hypercom.

**Details of the Baseless Lawsuits Brought Against Hypercom**

38.     Verve asserted unfounded allegations of patent infringement against Hypercom.  Verve, with the agreement and assistance of Omron, launched a campaign against Hypercom and others for the purpose of instituting costly and inconvenient

- 10 -

1    litigation alleging multiple claims of patent infringement in order to secure "settlements"

2    that extract monetary tribute from Hypercom in order to stop Verve's harassment.

3         39.    Verve and Omron expressly aimed this campaign of harassment and

4    extortion at Hypercom in Arizona.  Indeed, the purpose of this scheme was to extract

5    money from Hypercom in Arizona.  These willful acts have harmed Hypercom, and Verve

6    and Omron knew that Hypercom was likely to suffer this harm in Arizona.

7         40.    On or about September 11, 2003, and without any notice or warning, Verve

8    filed suit against Hypercom and two other unrelated companies in Michigan alleging

9    infringement of Omron's U.S. Patent No. 4,678,895.

10        41.    Specifically, on September 11, 2003, Verve filed a complaint against

11   Hypercom in the U.S. District Court for the Eastern District of Michigan, captioned *Verve*

12   *L.L.C. vs. VeriFone, Inc., Lipman USA, Inc. and Hypercom Corp.*, Civil Action No. 03-

13   73481 (the "Michigan Action").  The original complaint filed in the Michigan Action

14   alleged that Hypercom infringed Omron's U.S. Patent No. 4,678,895.

15        42.    The Michigan Action was commenced against Hypercom without probable

16   cause.

17        43.    Michigan had no substantial connection with the claims asserted against

18   Hypercom in the Michigan Action.  None of the defendants sued in the Michigan Action

19   had their principal place of business in Michigan.

20        44.    Four days after filing the Michigan Action, and ten days after Verve

21   purportedly acquired U.S. Patent No. 4,678,895, Verve wrote to Hypercom in Arizona

22   enclosing a copy of the original complaint filed in the Michigan Action, indicating that

23   Verve had not yet served the complaint.  Verve gave Hypercom 30 days to "provide

24   Verve a proposal for settling this matter."  Hypercom's subsequent attempts to explore the

25   potential for settlement of the specious claims asserted by Verve were unsuccessful.

26   Raymond M. Galasso has indicated to Hypercom that he and/or Verve intended to keep

27   filing patent infringement lawsuits against Hypercom until Hypercom agreed to pay Verve

28   to go away.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

- 11 -

45.　On October 10, 2003, Verve filed a First Amended Complaint and Jury Demand in the Michigan Action, and added five more unrelated defendants to the action. Specifically, the additional defendants are Ingenico Corp. USA, Thales e-Transactions, Inc., Telecheck Services, Inc., LinkPoint International, Inc., and Schlumberger Limited. The products made and sold by Hypercom that are accused of infringement were independently developed and are completely different from the accused products offered for sale by the other defendants in the Michigan Action.

46.　On October 14, 2003, U.S. Patent No. 4,562,340 and U.S. Patent No. 4,562,341 were purportedly assigned to Verve by Omron. One day later, on October 15, 2003, Verve filed a Second Amended Complaint and Jury Demand in the Michigan Action, attempting to add U.S. Patent No. 4,562,340 to the lawsuit and alleging that Hypercom and the other defendants also infringe that patent. The Second Amended Complaint was rejected because Verve failed to obtain leave of court to file the pleading as required by Rule 15(a) of the Federal Rules of Civil Procedure.

47.　On October 16, 2003, Verve again wrote to Hypercom in Arizona enclosing a copy of the First Amended Complaint and Jury Demand, and a copy of the Second Amended Complaint and Jury Demand, and stating "Please note that these Complaints have not yet been served."

48.　Having failed in their efforts to extract tribute from Hypercom, on January 2, 2004, Verve wrote to Hypercom's counsel in Arizona and requested waiver of service of summons in the Michigan Action.

49.　On May 11, 2004, the U.S. District Court for the Eastern District of Michigan entered an Opinion and Order granting Hypercom's motion to sever the patent infringement claims asserted against Hypercom, and transferring the case against Hypercom to this Court in the District of Arizona.

50.　The Michigan Court issued a notice of transfer on May 17, 2004.

51.　The transferred file from the Michigan Action arrived in this Court on or about May 20, 2004. The case was assigned civil action No. 04-CV-1030 PHX JAT.

- 12 -

1    52.    Verve's Michigan lawsuit against Hypercom was filed solely for purposes
2  of harassment and extortion, and to further the improper purposes of a conspiracy between
3  Verve and Omron.  As soon as the Michigan Action against Hypercom arrived in the
4  District of Arizona, Verve filed a notice of dismissal and unilaterally dismissed the case
5  on June 8, 2004.  Having lost the ability to harass Hypercom with litigation in a distant
6  and inconvenient forum, Verve dismissed the action because Verve truly had no interest in
7  obtaining an adjudication on the merits.

8    53.    In an apparent effort to increase the harassment value of its patent
9  infringement claims, on February 4, 2004, Verve filed a complaint against Hypercom in
10  the U.S. District Court for the Western District of Texas, captioned *Verve L.L.C. vs.*
11  *Hypercom Corporation, VeriFone, Inc., Ingenico Corporation USA, Thales e-*
12  *Transactions, Inc., First Data Corporation, Radiant Systems, Inc., CyberNet USA, Inc.,*
13  *and Mist Inc., USA*, Civil Action No. A04-CA-062 (the "Texas Action").  The complaint
14  filed in the Texas Action alleges that Hypercom infringes U.S. Patent No. 4,562,341.
15  Although Telecheck Services, Inc. (a defendant in the Michigan Action) has its principal
16  place of business in Houston, Texas, and Texas would have been a convenient forum for
17  that company, Verve choose not to sue Telecheck in the Texas Action.  Similarly,
18  Schlumberger (a defendant in the Michigan Action) has significant operations in Texas,
19  and Texas would have been a convenient forum for that company as well, yet Verve chose
20  not to sue Schlumberger in the Texas Action either.

21    54.    The Texas Action was commenced against Hypercom without probable
22  cause.

23    55.    Although the Texas Action was commenced on February 4, 2004, Verve
24  made no effort to serve Hypercom until May 11, 2004.  Instead, Verve attempted to use
25  the chilling effect created by the mere existence of the lawsuit as leverage against
26  Hypercom in its efforts to extract money from Hypercom.

- 13 -

1    56.    Texas had no substantial connection with the claims asserted in the Texas

2  Action against Hypercom. None of the defendants sued in the Texas Action had their

3  principal place of business in Texas.

4    57.    On December 29, 2004, the U.S. District Court for the Western District of

5  Texas entered an order granting Hypercom's motion to sever the patent infringement

6  claims asserted against Hypercom, and transferring the case against Hypercom to this

7  Court in the District of Arizona. Hypercom filed an answer to the complaint before the

8  case was transferred to cut off Verve's ability to unilaterally dismiss the case after it was

9  transferred to Arizona.

10    58.    On January 31, 2005, the transferred Texas Action arrived in this Court, and

11  the case was assigned civil action No. 05-CV-0365 PHX FJM.

12    59.    On December 12, 2005, Verve's patent infringement claims in the

13  transferred Texas Action were dismissed by this District Court.

14    60.    On or about July 31, 2004, Verve filed a complaint with the International

15  Trade Commission ("ITC") in Washington, D.C., naming Hypercom as a respondent, and

16  alleging that Hypercom infringed yet another Omron patent (the "ITC Action"). A

17  number of other unrelated companies were also named as respondents. The ITC Action

18  was captioned In the Matter of Certain Point of Sale Terminals and Components Thereof,

19  Inv. No. 337-TA-524.

20    61.    The ITC Action was commenced against Hypercom without probable cause.

21    62.    An attorney in the Simon, Galasso & Frantz law firm signed the complaint

22  filed in the ITC Action. In addition, Kevin R. Imes signed a verification of the complaint

23  filed in the ITC Action. Imes verified under penalty of perjury that "the allegations and

24  statements made in the complaint are well grounded in fact and are warranted by existing

25  law or a good faith argument for the extension, modification, or reversal of existing law."

26    63.    Neither Verve nor Omron conducted an adequate pre-filing investigation as

27  required by 19 C.F.R. § 210.4(c), prior to commencement of the ITC Action in order to

28  verify that the patent infringement claims asserted against Hypercom had evidentiary

- 14 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    support and were warranted by existing law or by a nonfrivolous argument for the

2    extension, modification, or reversal of existing law or the establishment of new law.

3    Verve failed to perform an adequate pre-filing investigation of the patent infringement

4    claims asserted in the ITC Action against Hypercom and the other respondents. Omron

5    claims that since the case was brought in Verve's name, Omron had no obligation to

6    perform an adequate pre-filing investigation of the patent infringement claims asserted in

7    the ITC Action against Hypercom.

8         64.    On February 7, 2005, an order was issued in the ITC Action finding that

9    Verve did not have standing to sue Hypercom or the other respondents in that proceeding

10   without joining Omron. The ITC applies the same law on standing as is applied in federal

11   district courts.

12        65.    Omron and Verve attempted to conceal a separate addendum to their

13   agreement that gave Omron the right to license anyone Omron wanted to under the patents

14   that Verve purportedly owned. A true and correct copy of the addendum is attached as

15   Exhibit 17, and is incorporated by reference herein. Omron executed fictitious

16   "assignment documents" to make it appear as if Verve had standing to sue on the Omron

17   patents without joining Omron as a party.

18        66.    On April 11, 2005, the ITC issued an order for Verve and its attorneys to

19   show cause why sanctions should not be imposed based upon, *inter alia*, Verve's failure to

20   conduct a preliminary investigation into whether the products at issue in that case

21   (including Hypercom's products) infringed the Omron patent asserted by Verve in the ITC

22   proceeding.

23        67.    On May 24, 2005, the Commission Investigative Staff filed a response on

24   the sanctions issue in the ITC, and recommended that Verve and its attorneys be

25   sanctioned $2,000,000 and receive a public reprimand for Verve's bad faith in bringing the

26   ITC action.

27        68.    On June 7, 2005, the administrative law judge in the ITC Action issued an

28   order imposing sanctions in the amount of $1,000,000 on Verve, Galasso, Imes, and the

- 15 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  Simon, Galasso & Frantz law firm. The sanctions order issued by the administrative law

2  judge in the ITC Action was designated as ITC Order No. 48, and was previously filed

3  with the Court on July 14, 2005, at Doc. #61, and is incorporated herein by reference.

4      69.    The administrative law judge in the ITC Action found that sanctions were

5  warranted, in part, "based on Verve's inadequate pre-filing investigation." Doc. #61, ITC

6  Order No. 48, at 1.

7      70.    In the ITC Action, the administrative law judge found that "Verve's filing of

8  the complaint in the face of virtually no pre-filing investigation of Hypercom's accused

9  products demonstrates an abuse of process and bad faith." Doc. #61, ITC Order No. 48, at

10  17.

11      71.    The administrative law judge in the ITC Action also found that "there was

12  virtually no [patent] claim construction performed by Verve prior to the filing of this

13  complaint." Doc. #61, ITC Order No. 48, at 12.

14      72.    The ITC Action has now been terminated in favor of Hypercom.

15      73.    On August 30, 2004, Verve commenced a civil action against Hypercom

16  and a number of other unrelated companies in the United State District Court for the

17  Northern District of California captioned Verve L.L.C. vs. VeriFone, Inc., CyberNe, Inc.,

18  Hypercom Corporation, Ingenico Corporation, Lipman USA, Inc., Thales e-Transactions,

19  Inc., and Trintech, Inc., Civil Action No. C-04-03659 HRL (hereafter the "California

20  Action") alleging that Hypercom infringed the same Omron patent that was involved in

21  the ITC proceeding in Washington, D.C.

22      74.    The California Action was commenced against Hypercom without probable

23  cause.

24      75.    Neither Verve nor Omron conducted an adequate pre-filing investigation as

25  required by Rule 11, Fed.R.Civ.P., prior to commencement of the California Action in

26  order to verify that the patent infringement claims asserted against Hypercom had

27  evidentiary support and were warranted by existing law or by a nonfrivolous argument for

28  the extension, modification, or reversal of existing law or the establishment of new law.

- 16 -

1    76.    The complaint filed in the California Action was signed by an attorney in

2    the Simon, Galasso & Frantz law firm, and Raymond M. Galasso, the managing member

3    of Verve, is also the head of the intellectual property group at the Simon, Galasso &

4    Frantz law firm, and had control over and supervised the attorneys at the Simon, Galasso

5    & Frantz law firm who entered appearances in the California Action.

6    77.    On February 15, 2005, Hypercom's counsel wrote a letter to Verve's

7    attorneys threatening to seek sanctions under Rule 11, Fed.R.Civ.P., if Verve did not

8    withdraw its complaint in the California Action.

9    78.    On or about March 8, 2005, Verve filed a notice of dismissal of Hypercom

10   in the California Action.

11   79.    The California Action has been terminated in favor of Hypercom.

12   80.    Omron or its representatives were aware of each lawsuit filed by Verve

13   against Hypercom before the lawsuit was filed.  Omron was aware that Verve had sued

14   Hypercom in Michigan, Texas, California, and in Washington, D.C.  At all times, Omron

15   had the power and the ability to stop the litigation against Hypercom.  Omron had the

16   power to control Verve.  Omron had the right to grant Hypercom immunity from suit on

17   any and all of the patents that Verve was asserting against Hypercom.

### First Count – Civil Conspiracy
### For Abuse of Process and Malicious Prosecution

18   

19   81.    Hypercom realleges the allegations set forth above in the preceding

20   paragraphs, which are incorporated herein by reference.

21   

22   82.    Verve and Omron agreed to accomplish the unlawful purpose of

23   commencing patent infringement actions against Hypercom without probable cause and

24   for the purpose of extracting monetary tribute from Hypercom.  As part of this agreement,

25   Omron purported to transfer patents to Verve to allow Verve to initiate a litigation

26   campaign of harassment against Hypercom.

27   83.    The agreement between Verve and Omron regarding the Omron patents

28   constitutes champerty and is contrary to public policy.

- 17 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E.  Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  84.  Pursuant to the agreement between Verve and Omron, Verve improperly

2  used the judicial process for the sole purpose of extorting money from Hypercom. This

3  abuse of process is wrongful and it is inconsistent with legitimate litigation goals.

4  85.  Pursuant to the agreement between Verve and Omron, Verve committed

5  acts in furtherance of the conspiracy constituting malicious prosecution. With Omron's

6  knowledge, consent and assistance, multiple patent infringement suits were filed against

7  Hypercom without probable cause and motivated by malice, which have now all been

8  terminated in favor of Hypercom, and which damaged Hypercom.

9  86.  These willful, overt acts of Verve and Omron pursuant to their agreement

10  were improper and illegal.

11  87.  As the proximate result of the actions taken by Verve and Omron pursuant

12  to their agreement to abuse judicial process and to engage in acts constituting malicious

13  prosecution, Hypercom has been damaged in an amount to be proven at trial.

14  **Second Count –Malicious Prosecution**

15  88.  Hypercom realleges the allegations set forth above in the preceding

16  paragraphs, which are incorporated herein by reference.

17  89.  Verve commenced civil actions against Hypercom alleging patent

18  infringement without probable cause. The civil actions were motivated by malice. The

19  civil actions have been terminated in favor of Hypercom. The civil actions damaged

20  Hypercom.

21  90.  Omron was an instigator of the malicious prosecution lawsuits that were

22  filed by Verve against Hypercom.

23  91.  As the proximate result of the acts constituting malicious prosecution taken

24  by Verve, which were instigated by Omron, Hypercom has been damaged in an amount to

25  be proven at trial.

26  **Third Count – Aiding and Abetting**
**Abuse of Process and Malicious Prosecution**

27

28

- 18 -

92.    Hypercom alleges the allegations set forth in the preceding paragraphs, which are incorporated herein by reference.

93.    Omron acted willfully and wantonly in encouraging and substantially assisting Verve to bring unfounded patent infringement suits against Hypercom without a having a good faith basis for believing that Hypercom had infringed upon any of the asserted patents.

94.    Omron assisted Verve by assigning a number of its patents to Verve to allow Verve to initiate its litigation campaign of harassment against Hypercom.

95.    With Omron's assistance, Verve pursued a scheme designed to unreasonably and vexatiously multiply the proceedings against Hypercom in order to maximize the harassment value of the baseless litigation.

96.    Omron participated in, contributed to, and substantially assisted Verve in the commission of the tortuous conduct described in the preceding paragraphs.

97.    Omron acted willfully and wantonly in providing substantial assistance to Verve.

98.    The foregoing acts constitute unlawful aiding and abetting of the commission of the tortuous conduct described above.

99.    Hypercom has suffered damage as a result of the acts of Omron in the aiding and abetting of Verve as described above.

**Prayer for Relief**

WHEREFORE, Plaintiff Hypercom Corporation prays for judgment in its favor and against Defendant Omron Corporation as follows:

A.    For an award of damages for the actual and compensatory damages suffered by Hypercom;

B.    For an award of punitive damages;

C.    For an award of the attorneys' fees and costs incurred by Hypercom in this action;

- 19 -

D.    For an award of interest at the highest allowable rate under the law; and

E.    That Hypercom be awarded such other and further relief as this Court may deem appropriate, proper and just.

DATED this 15th day of December, 2005.

SNELL & WILMER L.L.P.


By:/s/ Sid Leach
      Sid Leach
      Monica A. Limón-Wynn
      Andrew F. Halaby
      One Arizona Center
      400 East Van Buren Street
      Phoenix, AZ  85004-2202
      (602) 382-6372
      (602) 382-6070 facsimile
      Attorneys for Plaintiff Hypercom Corporation

- 20 -